## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| **ROBERT CORKERY**<br>*Plaintiff,*<br><br>**v.**<br><br>**COINSTAR, LLC.,**<br>*Defendant.* | **C.A. No. 1:23-cv-362**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## COMPLAINT

This action is commenced by Robert Corkery (hereinafter "Plaintiff") against Coinstar, LLC (hereinafter "Defendant" or "Coinstar") to remedy and seek relief for unlawful employment practices, specifically retaliation for protected acts, arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *Rhode Island Fair Employment Practices Act*, , R.I. Gen § 28-5-1 *et seq*., ("FEPA"), the *Rhode Island Civil Rights Act of 1990,* R.I. Gen. Law § 42-112-1 *et seq.* (hereinafter "RICRA"), and retaliation for protected acts under *Rhode Island Whistleblowers' Protection Act* ("WPA"), R.I. Gen. Law § 28-50-1, *et seq*.

## PARTIES

1. Plaintiff presently resides in the City of Saunderstown, County of Washington*,* within the State of Rhode Island and formerly worked for Defendant remotely in Rhode Island.

2. Defendant Coinstar, LLC is a primarily domestic, for-profit corporation based in the City of Bellevue in the State of Washington.

1

**JURISDICTION AND VENUE**

3. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case or controversy. Consideration of judicial economy, fairness, and convenience warrants this Court's exercise of supplemental jurisdiction over Plaintiff's state law claims.

5. This Court has personal jurisdiction over Defendant because Defendant has the requisite minimum contacts with the State of Rhode Island and availed itself of the rights and privileges in Rhode Island by conducting interstate commerce in Rhode Island; this Court exercising personal jurisdiction over Defendant does not offend the traditional notion of fair play and substantial justice.

6. Venue of this action lies under Title VII pursuant to 42 U.S.C. § 2000e-5(f)(3) or the Title VII claims under all two applicable factors: Plaintiff experienced unlawful employment practice in this judicial district and but for the alleged unlawful employment practices, Plaintiff would have worked in this judicial district.

7. Venue of this action for the remaining claims is proper pursuant to 28 U.S.C. § 1391(b) because Defendants conduct business in the State of Rhode Island, because the alleged unlawful practices occurred in Rhode Island, and because the evidence exists, in part, in Rhode Island, and thus this judicial district of this Court is proper.

**ADMINISTRATIVE PROCEDURES**

8. On or about March 14, 2023, Charges of Discrimination were timely filed with the Rhode Island Commission for Human Rights (RICHR) and co-filed with the Equal Employment Opportunity Commission (EEOC).

9.    On or about July 24, 2023, RICHR issued its Notice of Right to Sue and thereafter the EEOC issued its Notice of Right to Sue both enabling this private civil action to be filed (RICHR NO. 23 ESH 215.

10.   On or about August 9, 2023, the EEOC issued its Dismissal and Notice of Rights (EEOC NO16J-2023-00112).

11.   This Complaint was timely filed after issuance of the RICHR and EEOC Notice of Right to Sue.

## FACTUAL ALLEGATIONS

14. Plaintiff worked for Coinstar from June of 2019 until on or about December 28, 2022 as the Director of Advertising Sales.

15.   On or about December 28, 2022, Plaintiff was unlawfully terminated in retaliation for his protected acts of reporting workplace sexual harassment / gender discrimination and additionally reporting race/ethnicity discrimination, in violation of Title VII and State analog laws such as FEPA and RICRA which prohibit retaliation, as well as in retaliation for his resistance to and/or whistleblowing activity regarding hidden cameras in Coinstar machines.

16.   By way of background, on or about June of 2019, Plaintiff interviewed remotely via zoom with Coinstar, LLC, (hereinafter "Coinstar" or "Employer"), from his home in Rhode Island.

17.   Coinstar is based out of Bellevue, Washington and Apollo Global Management, Inc. is Coinstar's parent company.

18.   At all times relevant since his hiring in June of 2019, Plaintiff worked remotely from Rhode Island, in his position as the Director of Advertising Sales.

19.   Plaintiff learned about the position with Coinstar while living in Rhode Island, when a former colleague contacted him and informed him that Coinstar had a remote job opening.

20.   Plaintiff was emailed/mailed a job offer on or around May 7, 2019 while at his home in Rhode Island.

21. Upon his hiring, Coinstar mailed Plaintiff the office equipment to his Rhode Island address.

22. While working for Coinstar, Plaintiff traveled for business in and out of Rhode Island via car and plane; he was allowed to claim mileage for business travel out of Rhode Island.

23. Coinstar directly deposited Plaintiff's pay and expense reimbursements into his Rhode Island bank account.

24. Coinstar has physical machines in Rhode Island and there is a Coinstar field tech based in Rhode Island.

25. Coinstar hired Plaintiff as Director of Advertising Sales because of his background and experience.

26. Plaintiff is a sales leader by trade; his professional qualifications include: an IAB digital salesperson certification, 15 years of Business-to-Business Consumer Packaged Good (hereinafter "CPG") selling, as well as 16 years of working directly for CPG manufacturers, for a total of 31 years of CPG vertical experience.

27. From when Plaintiff started work at Coinstar in June 2019, until near the time of his termination, Plaintiff enjoyed his work and was successful at it.

28. At all times relevant, Plaintiff met or exceeded Coinstar's legitimate expectations.

29. In fact, from 2019 through 2022, his annual merit increase was between approximately 2.5 and 4%.

30. In 2022, Plaintiff earned over$256,950.00 in total compensation.

31. However, based on 2023's Coinstar-approved forecast of sales, approved by Mr. Pantalone, Plaintiff would have earned approximately $300,000.00 in total compensation with commissions.

32. In all of his performance reviews during his employment, Plaintiff was fully meeting expectations; in fact, in his last few months at Coinstar, once Plaintiff took over direct ad sales in mid-September of 2022, Plaintiff exceeded prior sales expectations and prior sales performance.

33. More specifically, Plaintiff sold advertising revenue in the approximate amount of $436,000.00 from just September of 2022 through December of 2022.

34.   This amount not only exceeded expectations and years prior, it was more than the *two former salespeople* sold in the *previous eighteen (18) months* cumulatively.

35.   Moreover, by December 2022, Plaintiff had achieved and surpassed his three performance commitments listed in their ultipro performance management system.

36.   Plaintiff achieved and exceeded all three "commitments" before he was terminated in 2022; "Commitments" are the three goals Plaintiff would have been measured against such as growth vs. last year and signing partnership.

37.   Plaintiff was not retained long enough to receive a 2022 performance review.

38.   Since he was hired in June of 2019 Plaintiff had built a highly successful advertising business for Coinstar; this was a major success story compared to Coinstar's previous attempt to launch an advertising business with a company called Pro Vision.

39.   In fact, by the time of his termination, revenue was higher than in previous years.

40.   Upon his hire, Plaintiff initially reported to Kevin McColly, (hereinafter "Mr. McColly") who was the CFO at the time Plaintiff was hired.

41.   Mr. McColly was promoted to CEO in July of 2022, and has since remained CEO at all times relevant herein.

42.   At the time Plaintiff was hired, Lee Pantalone (hereinafter "Mr. Pantalone"), was the Head of Sales for Coinstar.

43.   Mr. Pantalone, who is currently the VP of Sales and Marketing, began overseeing Plaintiff's department and Plaintiff on or about June of 2022.

44.   In or around the fall of 2019, Coinstar created the adPlant Digital Advertising Platform (hereinafter "adPlanet"), in an effort to drive incremental sales revenue for Coinstar, because Coinstar had promised certain sales outcomes to the equity capital group that owns Coinstar, Apollo Global Management (hereinafter "Apollo").

45. Initially, Coinstar contracted for the services of Brian Dusho (hereinafter "Mr. Dusho"), to consult on standing up the adPlanet project.

46. Soon into working with Mr. Dusho, Plaintiff's subordinate Mr. Hoy and Plaintiff noticed that Mr. Dusho was inebriated and slurring his words on virtually every internal and external call.

47. Plaintiff and Mr. Hoy reported this to Coinstar senior management multiple times, specifically to Head of Product, Michael Jack (hereinafter "Mr. Jack").

48. Despite their reports, nothing was done by Mr. Jack.

49. However, once more Coinstar colleagues had commented about similar experiences with Dusho being inebriated, then Mr. Jack finally terminated Mr. Dusho's work with Coinstar.

50. It was then that CEO Mr. McColly and Mr. Jack, decided to create a full-time General Manager position to oversee the adPlanet project.

51. The General Manager role was different than Plaintiff's role as the Director of Advertising Sales in that it was strategic rather than about managing day-to-day operations.

52. On or about September or October 2021, Mr. McColly hired Chris Pezzello (hereinafter "Mr. Pezzello") as adPlanet's first General Manager.

53. Mr. McColly also included Mr. Jack and Plaintiff in the selection and hiring process for the role.

54. Plaintiff was allowed to provide feedback about the two candidates, one being Mr. Pezzello, but Plaintiff did not make the ultimate hiring decision; Plaintiff communicated concerns about Mr. Pezzello's hiring to Mr. McColly which involved concerns about how Mr. Pezzello would treat others due to his gruff personality style.

55. Mr. McColly and Mr. Jack decided to hire Mr. Pezzello.

56. Upon information and belief, the hiring of this General Manager role, and specifically the hiring of Mr. Pezzello, was of particular importance to Mr. McColly, because he had promised certain sales outcomes to Apollo based on the expected performance of Mr. Pezzello.

57. In other words, if Mr. Pezzello failed or, as it occurred – had to be fired due to inappropriate behavior, such as behavior that violated Title VII – it would reflect very poorly upon the CEO, Mr. McColly, in the eyes of his bosses at Apollo.

58. Upon Mr. Pezzello starting at Coinstar, it became apparent right away that Mr. Pezzello was creating a toxic and hostile environment, especially for Plaintiff's subordinate, Mr. Hoy – who is one of the few Hispanics at Coinstar – and also for both women at Coinstar, and women who wanted to work for Coinstar.

59. Generally speaking, Mr. Pezzello swore frequently and acted like he was in a "locker room" environment rather than at work.

60. With respect to Mr. Pezzello's harassment of Hispanic workers, there were a couple of examples.

61. First, with respect to Mr. Hoy, who is Hispanic, Mr. Pezzello seemed to have it out for him for no legitimate reason; he targeted Mr. Hoy by being extremely crucial of him and pressured Plaintiff to terminate Mr. Hoy for no legitimate reason.

62. Second, Mr. Pezzello would intentionally pronounce the name of a Hispanic employee named Jaime Rodriguez ("Mr. Rodriguez") wrong; Mr. Rodriguez went out of his way to ensure coworkers knew his name was pronounced "hy-may" but Mr. Pezzello would pronounce it "ja-mee" then laugh when Mr. Rodriguez would get upset at Mr. Pezzello's mispronunciation.

63. Mr. Hoy and Plaintiff complained about Mr. Pezzello's treatment of Mr. Hoy more than once to various leadership, including to Mr. Jack and Mr. McColly, with no resolution.

64. Within the first few weeks working with Mr. Pezzello, it also became apparent that Mr. Pezzello's harbored severe gender biases against women.

65. Mr. Pezzello's gender bias was apparent to Plaintiff because Mr. Pezzello openly shared misogynistic opinions at work.

66. On a regular, near daily if not daily (upon interacting) basis, Mr. Pezzello degraded and made fun of women, including respectable female coworkers; Mr. Pezzello otherwise acted offensively towards women in front of Plaintiff and his coworkers, which offended Plaintiff and others.

67. For example, in November of 2021, the adPlanet team attended a sales team meeting in New York City and while Mr. O'Rourke, one of the salespeople under Plaintiff and Mr. Pezzello's chain of command, was speaking with a woman, Mr. Pezzello made comments to him in front of Plaintiff, such as "you should slam that," and was generally behaving aggressively, sexualizing and degrading the woman.

68. Moreover, Mr. Pezzello tried to make the team all go to a strip club while in New York.

69. As another example, Mr. Pezzello mocked the Head of Marketing, Jennifer Margolis' (hereinafter "Ms. Margolis") voice which he thought was high-pitched; he would say "how would you like to be married to that, she sounds like nails on a chalkboard" and encourage his all-male staff to laugh at his mockery.

70. Mr. Pezzello would also refer to their HR contact, Judy Josey, as a "cat lady," which is a gender-related stereotype.

71. Mr. Pezzello would also frequently comment on the physical appearance of women and degrade women, including the women they worked with, calling some "fat".

72. Additionally, Mr. Pezzello expressed on many occasions that he refused to hire a woman.

73. On one occasion in January of 2022, Mr. Pezzello specifically refused to hire a female, Rebecca Cuje for their team, despite her being very well qualified for the entry-level sales role she had applied for.

74. On January 22, 2022, Plaintiff sent Mr. Pezzello an email advocating to hire this female salesperson.

8

75. In response, Mr. Pezzello called Plaintiff and stated, "we can't keep the old boys club if we hire her."

76. On multiple other occasions, Mr. Pezzello stated to them – the all-male sales team – that "we needed to keep the old boys club so that we can talk like this."

77. Plaintiff was offended by these comments and made his displeasure known to Mr. Pezzello.

78. Plaintiff felt, initially, he could not do anything because of Coinstar's culture being mostly older, white, males and not wanting to alienate his boss and risk losing his job.

79. Around the same time in early 2022, Coinstar started initiatives to improve diversity and create a culture of inclusion.

80. In fact, by April 30, 2022, Plaintiff and other employees had to complete five courses including one about violence in the workplace and one course called "moving from bias to inclusion in a DEI journey."

81. DEI, upon and belief, stands for Diversity, Equity, and Inclusion.

82. Prior to this, Plaintiff had been in a town hall meeting where Julie Jackson ("Ms. Jackson") of HR presented Coinstar workforce demographics compared to other companies.

83. Ms. Jackson's conclusion was that Coinstar was far from as diverse as other companies.

84. Ms. Jackson shared that Diversity, Equity, and Inclusion (DEI) were going to become a company focus and priority.

85. Specifically, as to the workforce makeup at Coinstar, with respect to gender, was only 19.5% women and 80.5% male.

86. Further the workforce was predominantly Caucasian with 63.7% Caucasian, 6.6% Hispanic, 7.1% African American, 7.1% Asian, 11.7% not specified, 3.7% two or more races.

87. Ms. Jackson announced that there would be changes including creating gender neutral job descriptions.

88.   Another one of the changes Ms. Jackson implemented was the DEI training that was due to be completed, along with the other courses, by April of 2022.

89.   By late May of 2022, between Ms. Jackson's push for inclusion and the ongoing offensive behavior of Mr. Pezzello, Plaintiff could no longer take Mr. Pezzello's behavior.

90.   Thus, during a May 25, 2022 step meeting[1] with CEO Mr. McColly, Plaintiff felt compelled to report Mr. Pezzello's unlawful behavior, including his inappropriate treatment of Mr. Hoy and his treatment of women.

91.   Specifically, Plaintiff reported to Mr. McColly that Mr. Pezzello was creating a "toxic" environment for Mr. Hoy, again one of the few Hispanics at Coinstar.

92.   Plaintiff reported that the only reason he suspected that Mr. Pezzello did not like Mr. Hoy was because he was Hispanic.

93.   Plaintiff further reported to Mr. McColly that Mr. Pezzello was targeting Mr. Hoy and trying to get Plaintiff to fire him which Plaintiff strongly disagreed with.

94.   Plaintiff further reported that given Mr. Pezzello's rampant sexism and "locker room" demeanor.

95.   Plaintiff specifically reported to Mr. McColly: "I had grave concerns" that Mr. Pezzello was making inappropriate comments about women and being "misogynistic" towards women that created a "toxic environment for women."

96.   Plaintiff also reported that "Pezzello is very sexist."

97.   Plaintiff further reported to Mr. McColly, that Pezzello "wouldn't allow us to hire Rebecca Cuje as he stated that it would 'ruin our all-boys club.'"

98.   Plaintiff further explained that Ms. Cuje was qualified for the entry level Sales/Marketing Coordinator job, but Pezzello said, "we can't hire a woman."

---

[1] A step meeting is a meeting with the boss above your boss at Coinstar.

99.  Plaintiff further reported to Mr. McColly that Pezzello makes gender-based comments about women including the head of marketing Jen Margolis and also about the HR contact, Judy Josey.

100.  Specifically, Plaintiff reported to Mr. McColly that Pezzello specifically made fun of Margolis because of her high-pitched voice.

101.  Plaintiff further reported to Mr. McColly that Pezzello called the HR contact, Judy Josey, a "cat lady."

102.  In fact, Mr. Pezzello had even sent Plaintiff a text about that once.

103.  Notably, all of the above reports made by Plaintiff's are protected acts under Title VII and state analogs.

104.  After Plaintiff finished his reports to Mr. McColly, Mr. McColly did not seem pleased that Plaintiff was complaining about Mr. Pezzello.

105.  Upon information and belief, Mr. McColly immediately notified Mr. Pezzello about Plaintiff's reports about Mr. Pezzello's behavior.

106.  The very next day after Plaintiff's May 25, 2022 call with Mr. McColly, specifically on or about May 26, 2022, Plaintiff had a call with Mr. Pezzello.

107.  During this call, Mr. Pezzello was very angry, yelling and extremely volatile with Plaintiff.

108.  Mr. Pezzello swore and yelled at during this phone call; he also berated Plaintiff about various subjects which could not reasonably be the basis for his anger.

109.  Notably, Mr. Pezzello admitted he had spoken to Mr. McColly about their step meeting the day before.

110.  Thus, Mr. Pezzello was acknowledging that he knew about Plaintiff's reports from Mr. McColly.

111.  In fact, at one point during the conversation, Mr. Pezzello stated something to the effect of, "I talked to him" referring to Mr. McColly.

112. Mr. Pezzello also indicated, clearly, that he was close to Mr. McColly, for example, stating, "…I'm a locker room guy, [Mr. McColly] knows I'm a locker room guy."

113. Further, Mr. Pezzello stated the following, "I was told by [Mr. McColly] to make any changes I want to make, that's what I was told by [Mr. McColly]."

114. Plaintiff took that statement as a threat to his job, by both Mr. Pezzello and Mr. McColly.

115. Based on that and many other threats and attacks during the call, Plaintiff felt that *suddenly* his job was at risk due to Plaintiff's reports about Mr. Pezzello to Mr. McColly.

116. For example, Mr. Pezzello stated, "…you under the radar and I'm just letting you know that."

117. Mr. Pezzello also stated, "[n]ow you're under the radar and microscope with [Mr. McColly]".

118. Plaintiff took Mr. Pezzello's anger as being directed towards him for his reports to Mr. McColly the day before.

119. Notably, Mr. Pezzello repeatedly referenced "yesterday", which was when Plaintiff had made his reports about Mr. Pezzello to Mr. McColly, several times during the angry call.

120. For example, Mr. Pezzello stated, "…I'm telling you you just got on the radar yesterday with [Mr. McColly] for some reason, ok."

121. Importantly, Mr. Pezzello stated to Plaintiff that Mr. McColly had even asked Mr. Pezzello if he "still wanted [Plaintiff] here."

122. At the end of that May 26, 2022 call, Plaintiff had extreme concerns about his job safety due to reporting Mr. Pezzello to Mr. McColly the day before[2].

123. The next day, during a follow up call on May 27, 2022, Mr. Pezzello *again berated Plaintiff* for issues that would not normally elicit such a strong reaction, nor that had in the past.

---

[2] In this timeframe Mr. McColly was about to become CEO so Plaintiff was concerned that Mr. Pezzello was relaying that Mr. McColly was so upset with Plaintiff from his reports the day prior.

124. Moreover, Mr. Pezzello did not treat similarly-situated employees who had not reported him to Mr. McColly in the way he treated Plaintiff – yelling and threatening them.

125. During this call, Mr. Pezzello even physically threatened Plaintiff for simply asking him if he had read an email.

126. Specifically, Mr. Pezzello said, "if I ever said that to one of my bosses, they would punch me in the face...that is a pretty douchey thing."

127. Due to the new-found retaliation by Mr. Pezzello, following Plaintiff's reports about Mr. Pezzello to Mr. McColly, on or about June 8, 2022, Plaintiff emailed Ms. Jackson of HR; Plaintiff emailed some initial concerns to Ms. Jackson.

128. Then following day, on or about June 9, 2022, Ms. Jackson and Plaintiff had a zoom meeting and during this Zoom meeting, Plaintiff reported Mr. Pezzello's unlawful treatment of women and his treatment of Hispanics including Mr. Hoy, in detail, among reporting other inappropriate behavior by Mr. Pezzello.

129. Specifically, first on this call with Ms. Jackson, Plaintiff complained about Mr. Pezzello talking about and trying to fire his subordinate, Mr. Hoy for no legitimate reason.

130. Plaintiff recalls pointing out that Mr. Hoy was Hispanic and in fact, one of the few Hispanics at Coinstar that he was aware of.

131. Plaintiff also reported to Ms. Jackson a great amount of detail about Mr. Pezzello's treatment of women.

132. Plaintiff recalls specifically reporting, "I think Pezzello is a misogynist," and that "he uses derogatory language to refer to women, including curses."

133. Plaintiff recalls specifically referencing that Mr. Pezzello uses derogatory language to refer to even women that worked with at Coinstar.

134. For example, Plaintiff recalls referencing Ms. Margolis and how Mr. Pezzello would make fun of her for her high-pitched voice.

135. On the zoom, Ms. Jackson looked shocked at the behavior Plaintiff was reporting.

136. Plaintiff further reported to Ms. Jackson, "he speaks about women in a crude manner on the sales team calls."

137. After Plaintiff reported some of the things Mr. Pezzello said, Ms. Jackson asked Plaintiff to repeat himself; this happened more than once.

138. Plaintiff also reported that he had observed Mr. Pezzello violating their written code of conduct.

139. Plaintiff specifically reported that to Ms. Jackson something to the effect of "Chris [Pezzello] is also violating our code of conduct by discriminating against women."

140. Ms. Jackson seemed apologetic about Plaintiff being exposed to Mr. Pezzello's behavior.

141. Plaintiff also reported to Ms. Jackson, "Chris [Pezzello] won't allow us to hire a woman" referring to the Rebecca Cuje specifically because, "it would 'ruin our all-boys club.'"

142. At that point Ms. Jackson gasped and said, "can you please repeat that."

143. Plaintiff repeated exactly what Mr. Pezzello had said again about Ms. Cuje.

144. Ms. Jackson informed Plaintiff that she was going to launch an investigation.

145. Plaintiff's reports to Ms. Jackson are protected activities under Title VII and state.

146. From late May of 2022 and June 28, 2022, there was an HR investigation into Mr. Pezzello's conduct, based upon Plaintiff's reports.

147. Plaintiff participated fully in this investigation and HR interviewed him multiple times.

148. Others were interviewed as well, including his subordinates Mr. Hoy, Mr. Marcou, Mr. O'Rourke, and Mr. Pezzello was also interviewed himself.

149. Then, on or about June 28, 2022, Mr. McColly and Ms. Jackson called a meeting with their entire team, including Plaintiff, Mr. Pantalone, Mr. Marcou, Mr. Hoy, and Mr. O'Rourke.

150.   Mr. Pezzello was not included in this meeting.

151.   In that meeting, CEO Mr. McColly and Ms. Jackson informed the team that Mr. Pezzello was "no longer with the company."

152.   A mere six (6) months later, to the day, Plaintiff would be terminated in retaliation for his reports resulting in Mr. Pezzello's termination, as well as for other unlawful reasons.

153.   Specifically, from that point forward, until his unlawful termination only six (6) months later, Plaintiff was suddenly a target of Mr. McColly and Mr. Pantalone, and later his new boss, Mr. Wohl; but the retaliation started with Mr. McColly.

154.   For example, for several months prior to May 25, 2022, Plaintiff had regular, bi-weekly step meetings with CEO Mr. McColly but these regular step meetings ceased *right after* Plaintiff's May/June 2022 reports to Mr. McColly and Ms. Jackson about Mr. Pezzello.

155.   Specifically, after Plaintiff's reports (and his participation in the subsequent investigation during May and June of 2022), Mr. McColly regularly moved or canceled Plaintiff's step meetings, through his secretary Malia Bineau (hereinafter "Ms. Bineau"); these were eventually ceased.

156.   In contrast, prior to his May 2022 reports, Mr. McColly regularly *maintained* these bi-weekly meetings with Plaintiff and during such meetings, Mr. McColly treated him with respect.

157.   However, from the time of his reports about Mr. Pezzello, Mr. McColly began to act negatively towards Plaintiff when they interacted.

158.   Mr. McColly also acted hostile towards Plaintiff and would regularly insult him Plaintiff for no valid reason.

159.   Mr. McColly did not treat Plaintiff hostilely or insult him prior to his reporting Mr. Pezzello, to him and to HR.

160.   Mr. McColly also began to misrepresent Plaintiff's work, for example, asking what is "wrong with adPlanet," and stating that the business was "down" when it was not.

161. Specifically at that time, adPlanet and the revenue Plaintiff was responsible for was up compared to 2021; moreover, internal documents and even emails sent by Mr. McColly touted Plaintiff's sales revenue performance to others, contradicting McColly's sudden criticisms of Plaintiff.

162. Notably, on June 28, 2022, the day Mr. Pezzello was terminated, Mr. Pantalone became the interim General Manager of adPlanet and Plaintiff's temporary boss.

163. Further, following Mr. Pezzello's termination on June 28, 2022, given Plaintiff's prior interactions with Mr. McColly and his deep involvement in the investigation by HR into Mr. Pezzello, Plaintiff expected Mr. McColly to follow up with him directly.

164. Instead, Mr. McColly froze Plaintiff out and continued to do so from that point forward.

165. In fact, instead of calling Plaintiff to regroup or discuss Mr. Pezzello's separation, Mr. McColly called Mr. Hoy, Plaintiff's subordinate, and asked him if he was alright.

166. Mr. McColly did not contact Plaintiff at all to ask how he was or circle back.

167. Plaintiff had to contact Mr. McColly himself on or about June 28, 2022 or June 29, 2022 to discuss Mr. Pezzello's separation and next steps and during this call, Mr. McColly was notable cold and short with Plaintiff; Mr. McColly even informed Plaintiff that they would no longer be meeting regularly during this call.

168. The plaintiff could immediately tell things had changed with Mr. McColly upon the announcement of Mr. Pezzello's separation.

169. In fact, from that point forward, when Plaintiff interacted with Mr. McColly, he was harsh, he would "grill" Plaintiff, unjustifiably criticize him, and, simply, always seemed angry at him; Mr. McColly also avoided Plaintiff and would contact Plaintiff's subordinate Mr. Hoy more frequently than before while contacting Plaintiff much less than before.

170. In fact, Mr. McColly started having regular meetings with Mr. Hoy, as he reduced his interactions with Plaintiff; meeting with Mr. Hoy, again, while rarely meeting with Plaintiff, was not the usual management workflow.

171. Mr. McColly even began meeting with Mr. Hoy weekly, not just bi-weekly, as he had been doing so with Plaintiff up until the point that Plaintiff reported Mr. Pezzello.

172. As time progressed, Plaintiff stopped hearing from Mr. McColly altogether most of the time.

173. The only reason for Mr. McColly's sudden change towards Plaintiff was that – just as Mr. Pezzello had told Plaintiff on May 26, 2022 – Mr. McColly had it out for Plaintiff for reporting Mr. Pezzello.

174. Then, from July of 2022, through his termination in December of 2022, Mr. McColly was not only cold and harsh to Plaintiff, he would raise his voice at or be unreasonably critical of Plaintiff; Mr. McColly also continued to inaccurately characterize adPlanet's sales performance, in addition to continuing to avoid Plaintiff and meet with only Plaintiff's subordinate.

175. For example, Mr. McColly's would frequently say "Apollo, had expectations for the business and we aren't meeting them" yet Mr. McColly did not make these comments to Plaintiff prior to his reporting Mr. Pezzello and his resulting termination; nothing had changed in that short time except that Plaintiff had reported Mr. Pezzello, resulting in his termination.

176. Additionally, the reality was at that time, by the fall of 2022, adPlanet revenue was up between 30-40% in annual digital advertising sales, versus the previous year.

177. Moreover, total 2022 revenue was up from previous year by approximately 27% above the previous year, and this good performance continued through Plaintiff's termination in December of 2022.

178. In the same timeframe that Plaintiff reported Mr. Pezzello, in or around May/June of 2022, Plaintiff began reporting concerns with hidden cameras in Coinstar machines.

179. The hidden cameras were not in every Coinstar kiosk but by the summer of 2022, there were hundreds of hidden cameras; a strategy called "sample and extrapolation" was used to estimate the potential audience metrics for selling advertising, shown on the Coinstar kiosks.

180. However, there were other available methods to measure potential audience metrics, without employing the use of hidden cameras.

181. Initially, in 2020, Plaintiff endorsed using a company called only "Q[3]" (hereinafter "Q"); Q used cameras and the extrapolation method to measure potential audience.

182. Previous to using Q, another methodology was utilized with another vendor, "G" (hereinafter "G"); G measured audience without cameras, but was not as effective as Q.

183. But later in 2022, just prior to his termination, Plaintiff identified another company, "P" (hereinafter "P") that had very accurate potential audience measurement without cameras as well.

184. Near the time of his termination, Plaintiff was working hard to evaluate transition to a non-camera company such as, P, as part of his whistleblowing regarding the legality of the cameras.

185. However, Plaintiff was terminated before he could complete his evaluation, and any transition, to a non-camera company, such as P.

186. Upon information and belief, Coinstar leadership preferred the hidden cameras method with Q, over the non-camera methods with P, for *purely* financial reasons, and thus resisted any change.

187. In fact, the more Plaintiff began to complain about the cameras in the second half of 2022, and then attempt to change to P, Coinstar leadership targeted Plaintiff for retaliation and eventually a pretextual termination.

188. However, at first, during the initial phase rolling out the cameras in 2020, Plaintiff was a supporter of the technology because it provided the most accurate audience measurement at the time, from

---

[3] Q's full business name is omitted for privacy as they are not a party to this litigation and there is no material reason to publicize their name.

what Plaintiff was aware, but also because Plaintiff had not yet experienced very real concerns that these cameras in Coinstar kiosks raised.

189. Plaintiff's initial support for the use of hidden cameras was based on his understanding that (1) the cameras were legal in all states that they were implemented in and the legal advice on this issue was sound, and (2) the retailers with the hidden camera kiosks on their premises had full knowledge of the hidden cameras in the machines.

190. As time went on, both of these understandings were proven incorrect, which is when Plaintiff developed, and voiced, concerns about the legality of the hidden cameras.

191. First, in 2020, there was a legal issue with the cameras.

192. Specifically, as part of the Q and Coinstar pilot, a grocery store in Grays Lake, Illinois received a hidden camera.

193. Plaintiff recalls that Coinstar outsourced the legal determination, as to the legality of each location of the 10 hidden cameras in the initial pilot, to the law firm Perkins Coie.

194. That law firm advised Coinstar that all cameras were perfectly legal in all pilot locations.

195. However, on or about a weeks to months later, Plaintiff learned that the cameras in Illinois were not acceptable; in fact, it was not even Coinstar or their legal team that identified the serious mistake as to the legality of hidden cameras.

196. The error in placing a camera in Illinois was discovered by Q, which informed Coinstar and their legal counsel that the Illinois camera had to be moved.

197. That camera was moved to Indiana in or about late 2020.

198. However, that camera, which was unlawful upon information and belief, was in place in the Illinois grocery store for weeks to months, despite being – upon information and belief – approved as legal by Coinstar's legal team.

199. As a result of that experience, as 2021 and into 2022 progressed, Plaintiff began to distrust the legal decisions that Coinstar obtained regarding the hidden cameras, as the camera usage was expanded across the country well beyond the 10 pilot locations to hundreds of locations.

200. Specifically, over 2021 and 2022, Coinstar installed hundreds of hidden cameras in approximately 18 different grocery chains in approximately 27 different states across the country.

201. Importantly, the few Coinstar staff who knew about these hidden cameras were directed, by Mr. McColly and Mr. Pantalone and other leadership, to call them "sensors".

202. Calling the cameras "sensors" hid the true nature of these video cameras.

203. In fact, technicians who installed the cameras had, upon information and belief, detailed instructions to subvert knowledge by the public and retailers that the technician was installing anything but a "sensor."[4]

204. The second issue that evaporated Plaintiff's trust in the legality of the hidden cameras by mid-2022, was the fact that Plaintiff learned that some to many to all of the retailers hosting the hidden cameras, upon information and belief, *were not actually aware of the hidden cameras.*

205. More specifically, the retailer relationships were handled by Mr. Pantalone, upon information and belief, in consultation with Mr. McColly; Plaintiff was not allowed much involvement in this part of the process.

206. Over time, Plaintiff began to learn – by comments made by Mr. Pantalone and Mr. McColly, as well as from other sources - that upon information and belief, a notable proportion, if not most/all, of retailers hosting the hidden cameras did not know about the hidden cameras.

---

[4] These hidden cameras were intentionally disguised from retailers and consumers; in fact, during the install of these cameras, the technicians were given an internal document from marketing which gave answers to potential questions that might come up about these "sensors." Moreover, Coinstar staff were strongly encouraged to refer to these cameras as "sensors" in all internal and external documents. But make no mistake, these were cameras – specifically they were ELP cameras which are commonly used in retail for store security via CCTV."

207. Plaintiff thus began to fear that the cameras were not legal in all states, including Rhode Island, and began to fear that these retailors were experiencing a risk of liability without even knowing it.

208. Plaintiff's concerns about the legality of the cameras were multifold; Plaintiff is not a lawyer but the buckets of concerns Plaintiff had, and expressed, crossed criminal and civil liability categories.

209. Plaintiff's concerns included that the cameras may be (1) prohibited by, and thus unlawful under, state recording laws in many states, including Rhode Island, (2) prohibited by, and thus unlawful under, state privacy laws in many states, including Rhode Island, (3) were unlawful in many states, including Rhode Island, due to recording employees at work, (4) invaded the individual common law privacy rights of individual's in many states, including Rhode Island, and (5) that the cameras were recording union-member grocery store employees in violation of those contracts/the law.

210. Plaintiff's legal concerns over the hidden cameras were for the potential liability, and potential unlawful conduct, by himself, by Coinstar, and by the retailers.

211. Plaintiff was particularly concerned that the retailers did not, upon information and belief in many/most/all cases, have any input into taking on that legal risk, *since many retailers did not even know about the cameras.*

212. Thus, by the summer of 2022, Plaintiff began to actively push back against using the hidden cameras which were making him increasingly uncomfortable; Plaintiff began to report his growing legal concerns to Coinstar leadership.

213. In response, Plaintiff was retaliated against by being increasingly isolated from leadership, by being increasingly scrutinized and criticized despite top performance, and by being replaced by two new hires only a few months later, in December of 2022.

214. Additionally, by the summer of 2022, Coinstar wanted to *increase* the number of cameras by another hundred and this made Plaintiff even more unconformable, raising to new levels his concerns about the legality of the wide-spread cameras.

215. Specifically, in the summer of 2022, Coinstar began installing an additional approximately 1700 digital screens and the Q recommended that Coinstar move approximately 20 cameras and add approximately another 102 *more* cameras to their non-camera kiosks, to help monitor the additional 1,700 digital screens that were being installed.

216. Plaintiff recalls feeling panicked when he imagined a retailer, employee, or customer seeing Coinstar "moving cameras" amongst their machines.

217. Thus Plaintiff pushed back even more against using the hidden cameras which were making him increasingly uncomfortable; Plaintiff more frequently reported his growing legal concerns to Coinstar leadership.

218. Specifically, Plaintiff began to complain about existing cameras, and resisted the installation of more hidden cameras during the summer through winter of 2022.

219. Plaintiff reasonably believed that these hidden cameras were in violation of state laws, including in Rhode Island, and Plaintiff's belief was reasonable based on the prior issue in Illinois where the camera had to be removed and moved to Indiana in 2020 after receiving, inaccurate – upon information and belief – legal advice.

220. Despite Plaintiff's concerns, Coinstar leadership wanted to add the 102 new cameras, and this effort was ramped up from the summer of 2022 through Plaintiff's termination in December of 2022.

221. Plaintiff feared these cameras were not always legal, at least in some states, and specifically began to be very uncomfortable about the legality of the cameras in Rhode Island due to personal experience with those cameras.

222. Rhode Island had, and still has, four of these hidden cameras in grocery stores throughout the state.

223. Upon information and belief, these four Rhode Island cameras, installed in grocery stores around the state, were installed in late 2020.

224. The location of the four Rhode Island machines with hidden cameras included a North Kingston, Rhode Island Stop and Shop on 10 Rod Road, a Wyoming/Richmond, Rhode Island Stop and Shop, a Cranston, Rhode Island Stop and Shop, and a Cranston, Rhode Island Shaw's grocery store.

225. The 10 Rod Road, North Kingston, Rhode Island Stop and Shop is Plaintiff's primary grocery store, *personally*.

226. Thus, whenever Plaintiff was grocery shopping at his grocery store, Plaintiff felt uncomfortable seeing the machine, knowing it was recording him as well as all of the customers and employees around him in his own local grocery store.

227. Plaintiff increasingly voiced his concerns about the legality of the hidden cameras to Coinstar leadership including CEO McColly, Mr. Pantalone, and later, to Mr. Wohl, among others, doing the second half of 2022.

228. Plaintiff had particular concerns with, and challenged, the plan to increase the number of installed cameras.

229. Further, as another measure of push back, Plaintiff began to attempt to replace Q with a vendor that did not use cameras, such as P.

230. Moreover, Plaintiff was made to feel even more uncomfortable when he learned that the software would allow Coinstar staff to peer through the lens of the cameras into the stores *live* to see what the camera was looking at in order to make manual adjustments to the camera.

231. Plaintiff was sent screenshots of what the camera could see at one point, in what Plaintiff understood to be a live test.

232. Plaintiff felt like a "peeping Tom" because it was like looking at an image from a closed-circuit video that no one knew was there.

233. Plaintiff reported later that, "it was like being a peeping Tom spying on whoever was in that given store and these employees and customers had no idea Coinstar was recording them."

234. Plaintiff was also increasingly concerned that Q stored the data on, assumedly, millions of people's faces, and Plaintiff was unsure if Q also stored the full video feed.

235. Plaintiff was likewise increasingly worried that even Q seemed concerned that store employees were on video for long periods of time and at one point, called Coinstar's attention to that fact.

236. Plaintiff recalls that Coinstar leadership, including Mr. McColly and Mr. Pantalone, were unconcerned with this fact which disturbed Plaintiff further.

237. Plaintiff continued raising concerns about liability of these hidden cameras for himself, for Coinstar, and for the retailers that had no knowledge of the cameras, increasingly, through his termination in December of 2022.

238. Specifically, Plaintiff raised these concerns of potential illegality and liability to the Coinstar committee that made the decisions regarding the cameras and also raised these concerns to the Coinstar leaders Mr. McColly and Mr. Pantalone.

239. When raising these concerns, Plaintiff even cited to the previous issue in Illinois.

240. Specifically, Plaintiff stated to those on the cameras committee, and to Coinstar leaders Pantalone and McColly, something to the effect of "wouldn't this be illegal to put cameras in new locations?"

241. When Plaintiff would raise these concerns, they were laughed off by other leaders.

242. A common reaction to Plaintiff raising concerns with the legality of these cameras was to joke about how they do not call them "cameras" and instead call them "sensors".

243. In fact, on one occasion when Plaintiff raised his concerns about the cameras, in or around summer or fall of 2022, only a few months prior to his termination, and Mr. Pantalone's reaction was, "I'd rather beg for forgiveness than ask for permission."

244. Mr. Pantalone further stated that, "We'll be fine as long as the retailers don't find out we have placed hidden cameras."

245. On another occasion in the same timeframe, Plaintiff raised his concerns about the cameras directly to Mr. McColly.

246. On that occasion, Plaintiff stated, "I am glad we are able to install an additional 1700 screens however it makes me nervous that we have to install another 102 cameras to measure those screens."

247. Mr. McColly flatly stated something to the effect, "didn't legal approve this in 2020."

248. Plaintiff's response was to push back, and state: "I am still not sure this is completely legal."

249. Mr. McColly seemed agitated and stated, "if legal says we are good, we are good."

250. Plaintiff was not satisfied with that answer due to what had happened in Illinois in 2020 *even after legal advice.*

251. Plaintiff began to be concerned about what else the legal counsel was wrong about with respect to the legality in the cameras now installed across the country, including in Plaintiff's own grocery store in Rhode Island.

252. Plaintiff also began to worry increasingly, "[a]m I going to be liable for all of this?"

253. In another interaction around that same time frame, just a few months before Plaintiff's termination, Plaintiff informed Mr. McColly about Mr. Pantalone's statement that "as long as the retailers don't find out [about the cameras], we are fine."

254. Mr. McColly sided with Mr. Pantalone and disregarded Plaintiff's concerns while expressing displeasure that Plaintiff was raising such concerns.

255. By Plaintiff raising concerns about the legality of the cameras, including those in Rhode Island and in his personal grocery store, Plaintiff obtained protection under the Rhode Island Whistleblower Protection Act ("WPA") for whistleblowing.

256. Notably, and increasingly in the second half of 2022, when Plaintiff raised concerns about the legality of the cameras and pushed back against the further rollout of hidden cameras as well as

25

pushed back in an attempt to change to a non-camera venor, Mr. McColly and Mr. Pantalone made their displeasure with Plaintiff's complaints known.

257. Through summer and fall of 2022, Plaintiff felt Mr. McColly and Mr. Pantalone were increasingly retaliating against him both for his whistleblowing regarding the hidden cameras and for his reports about Mr. Pezzello, resulting in his termination.

258. During that time, Plaintiff was increasingly isolated by leadership.

259. Specifically, during September and October of 2022, Mr. McColly continued to target Plaintiff with unjust criticism, and continued to isolate, separate Plaintiff from himself and other leadership, and treating Plaintiff negatively and harshly.

260. Mr. Pantalone also seemed to isolate Plaintiff and avoid him.

261. Mr. McColly and Mr. Pantalone did not act this way towards Plaintiff prior to Plaintiff's reports about Mr. Pezzello or before he increasingly raised concerns about the legality of the cameras.

262. For example, Mr. McColly would send out emails to leadership touting adPlanet successes, which Plaintiff was responsible for, but then in emails to only Plaintiff, Mr. McColly would criticize the success of his work, as can be seen by contrasting the September 6, 2022 and September 11, 2022 emails below.

263. Specifically, on or about September 6, 2022, Mr. McColly sent an email to Coinstar leadership highlighting adPlanet's success in producing "6500 new adPlanet toppers," and Coinstar's plan to "focus resources on driving revenue through those assets."

264. In contrast, on or about September 11, 2022, CEO Mr. McColly sent Plaintiff an email asking why the adPlanet business was faltering.

265. Moreover, Mr. McColly's criticisms did not align with the reality of the adPlanet numbers, which were up significantly over the previous year.

266. By September of 2022, the two salespeople who reported to Plaintiff had left and Plaintiff took over their roles and the direct advertising sales became part of Plaintiff's job.

267. Plaintiff performed this work in addition to his own job managing adPlanet.

268.  Plaintiff did both jobs very well including ramping up direct advertising sales to higher than it had been with *two* salespeople, by the end of 2022.

269. Barely after even taking over for *two* salespeople, in addition to his own job, on or about October 10, 2022, Plaintiff got a another faux-concern email from Mr. McColly – again despite the business Plaintiff was responsible for being up year over year.

270. Soon after that, and without any notice or having been invited to take part in the hiring process as had been standard practice prior, suddenly Mr. McColly announced that he had hired a new General Manager to replace Mr. Pezzello.

271. Plaintiff had not even been informed by Mr. McColly that he was searching for another General Manager.

272. Upon information and belief, Mr. McColly and Mr. Pantalone, and possibly members of HR, had one or more discussions, where Plaintiff was excluded, discussing the hiring of a new General Manager.

273. Mr. McColly's failure to notify Plaintiff that he was hiring Plaintiff a new boss was a significant deviation of prior company practice.

274. To reiterate, during the hiring of Mr. Pezzello, Mr. Mr. McColly involved Plaintiff *and Plaintiff even interviewed Mr. Pezzello*.

275. In fact, Plaintiff was involved in the hiring of *all members* of his team, including those above and below him, *up to that point*.

276. In contrast, the hiring of this new General Manager, Cliff Wohl (hereinafter "Mr. Wohl") was done by CEO Mr. McColly and Mr. Pantalone in total secrecy (from Plaintiff).

277. Mr. McColly simply notified Plaintiff of the hiring, once it was complete, on or about October 19, 2022.

278. Not involving Plaintiff – or even notifying him – of the hire of his new boss Mr. Wohl, was a significant divergence from prior business practice.

279. Notably, only nine (9) weeks later Plaintiff was terminated suddenly.

280. Upon Mr. Wohl's hiring, and from that time forward, Plaintiff's job duties began to be stripped.

281. Upon information and belief, Mr. Wohl was hired to replace all of Plaintiff's job functions except the direct sales; that person would be hired the same month Plaintiff was terminated, again in secrecy.

282. For example, after Mr. Wohl's hiring, first he tried to strip Plaintiff of his subordinate Nathan Hoy.

283. Specifically, in the email notifying Plaintiff and his subordinate Nathan Hoy of Mr. Wohl's hiring, Mr. McColly stated that they (Nathan Hoy and Plaintiff) would "both" be reporting to Mr. Wohl; specifically, it stated: "Cliff will report to Lee, and you both will report to Cliff [Wohl]."

284. After that email, both Mr. Wohl and Mr. McColly further striped Plaintiff of his responsibility for Mr. Hoy and changed the reporting structure for Mr. Hoy to no longer report to Plaintiff.

285. Mr. Hoy protested, upon information and belief, and this change did not happen (at least not while Plaintiff was still employed at Coinstar).

286. Additionally, after Mr. Wohl was hired in October of 2022, Plaintiff complained to Mr. Wohl about the secret cameras; Mr. Wohl appeared, at first, to have concerns as well as he suggested "why we wouldn't just go back to [G]" and to their measurement capabilities, which do not involve hidden cameras.

287. Plaintiff explained to Wohl that a decision had been made by leadership in or about 2020 to change from G to Q because it would increase revenue potential.

288. This decision was made by Mr. McColly and Mr. Pantalone.

289. By October and November of 2022, Plaintiff increasingly raised concerns about the legality of, and potential liability for himself, Coinstar, and the retailers, the hidden cameras; he did so in meetings and to leadership, including Mr. McColly and Mr. Pantalone, directly.

290. In fact, just before or during this time, Plaintiff had begun to actively explore using *other vendors without cameras* to achieve the same audience measurement goals, and replace Q and its cameras.

291. Specifically, Plaintiff began to explore a company called P, from a partner of Coinstar, "PE" (hereinafter PE).

292. Plaintiff assigned Mr. Hoy to obtain test data from this camera free measurement technology by P/PE.

293. Mr. Hoy agreed, at one point prior to Plaintiff's termination, that using a "no camera" technology was a lot better than using hidden cameras.

294. In October of 2022, the plan to install the additional cameras (and move some) was ramping up and Plaintiff increasingly raised concerns about the rollout of more cameras.

295. In early October of 2022, Plaintiff began to be in contact with P/PE directly.

296. On or about October 3, 2022, Plaintiff had Mr. Hoy schedule a meeting with P/PE.

297. The meeting occurred on October 5, 2022.

298. After that, Plaintiff tried to move Coinstar towards a non-camera technology but received significant resistance from Mr. Pantalone and Mr. McColly.

299. By on or about October 20, 2022, Q had provided the final plan to install 102 more cameras and move 20 cameras; Plaintiff passed this plan along to Mr. Pantalone by email.

300. In that same email, Plaintiff noted that the cameras had not yet been purchased.

301. Because the ordering of the cameras was delayed, and not yet completed by that email on October 20, 2022, Plaintiff hoped a decision would be made to not order and install more cameras.

302. Plaintiff also used the opportunity to test the waters with Q regarding *not* adding more cameras in or around October of 2022 *at all*.

303. Specifically, in an October 27, 2022 email from Plaintiff to Q, Plaintiff used the delay in ordering cameras to suggest using only existing cameras, and "extrapolate impressions for the new locations in the interim."

304. Q's reaction was that this could be done.

305. Plaintiff felt relief and hoped that if the extrapolation, using only existing cameras, could work in the short term, he could push an initiative to *not* install more cameras *or* move to a non-camera technology such as P/PE.

306. Around that same time, Plaintiff and his team also identified anomalies in the existing camera measurements in a few locations.

307. Plaintiff used this anomaly to suggest delaying the rollout of more hidden cameras as well.

308. Specifically, on or about October 25, 2022, Plaintiff sent an email suggesting that "before we roll out the additional cameras I think we should examine the existing situation to ensure that we are optimizing the measurement of our network."

309. In the meantime, Plaintiff continued to push forward trying to determine if a non-camera technology like P, from PE, could work.

310. In early November of 2022, Plaintiff continued to attempt to get data on the P/PE technology and in the meantime, was pushing to hold off expanding the number of hidden cameras with Q.

311. In this same timeframe, Plaintiff asked Mr. Pantalone to hold the pending invoice for Q until P/PE could be vetted.

312. More specifically, on or about November 10, 2022, in an email with Mr. Pantalone regarding a Q invoice, Plaintiff responded about holding a Q invoice, "[w]e're waiting for Nathan [Hoy] to get back the data from [PE] on their measurement test.

313. Plaintiff was also increasingly concerned about moving camera and what would happen to all the data from those old camera locations.

314. Thus, in a November 17, 2022 email to Q, Plaintiff asked if the data could be deleted from the cameras that were moved.

315. On or about November 21, 2022, Plaintiff emailed Mr. Hoy again, asking for him to provide the data from P/PE so they could finalize the evaluation of the P/PE non-camera technology.

316. That date was a month before Plaintiff was suddenly terminated.

317. In the meantime, Plaintiff continued to advance arguments to not install more cameras, and instead, to extrapolate the Q data; in fact, the last time Plaintiff raised this to Mr. Pantalone was in or around November of 2022, during a meeting in Indianapolis.

318. This meeting in November of 2022 in Indianapolis included Mr. Pantalone, Mr. Wohl, Mr. Hoy, and others on the committee overseeing the hidden cameras.

319. During this meeting Plaintiff again raised his concerns, to all present, specifically, with the legality of having hidden cameras.

320. During this meeting, Plaintiff also raised his concern that he, "thought it would be a big deal if retailers found out that we had installed hidden cameras in their stores and that they had been placed there for over two years."

321. Yet again, in response, both Mr. Pantalone and Mr. Wohl dismissed Plaintiff's concerns.

322. Further, Mr. Pantalone and Mr. Wohl seemed increasingly frustrated with Plaintiff raising such concerns about the legality of the cameras, yet again.

323. Mr. Wohl, Plaintiff's new boss, as well as Mr. Pantalone, responded by reminding Plaintiff to call them "sensors" and blew off Plaintiff's concerns.

324. Not long before his termination, Plaintiff also specifically raised legal concerns with the cameras in his home state, Rhode Island, to Mr. McColly and Mr. Pantalone.

325. Specifically, in a conversation with CEO McColly and Mr. Pantalone, Plaintiff specifically raised concerns about his own Rhode Island, Stop and Shop camera and its legality.

326. Plaintiff also reported "how uncomfortable it made [him]" to know there was a camera in that machine recording himself, other shoppers, and Stop and Shop staff, all without their knowledge."

327. Plaintiff recalls also stating something to the effect of, "I have one in my neighborhood store and every time I shop there it's in the back of my mind that I could be liable if anyone sees it."

328. Plaintiff's concerns were again ignored and not long after he was terminated.

329. Between these November 2022 conversations and his termination, Plaintiff continued to push for a change to a non-camera technology.

330. Upon information and belief, at the time of Plaintiff's termination, Mr. Hoy was beginning to make some progress on the data from P/PE.

331. Plaintiff's actions clearly fall under the RIWPA and he was terminated to prevent future whistleblowing and in retaliation for ongoing whistleblowing.

332. Plaintiff was the only leader that shared his concerns about the legality of the hidden cameras.

333. As a matter of fact, most of the other managers, including Dave Weinstock (hereinafter "Mr. Weinstock") were mostly concerned with costs associated with the labor to install and move these cameras; another manager, Jeff Lail (hereinafter "Mr. Lail") expressed the same labor concerns.

334. No other company official raised concerns about the legality of the camera installations; Plaintiff was the lone whistleblower.

335. During this last month of employment, despite Plaintiff doing adPlanet and the direct sales jobs[5] – and doing them successfully –Mr. McColly continued, and Mr. Wohl quickly started, with harsh communications and unjust criticisms of Plaintiff.

---

[5] Plaintiff was still doing his job (but for the parts Mr. Wohl was starting to strip after his hire) and Plaintiff was doing the direct sales job of the two departed salespeople.

336. Mr. McColly also continued to circumvent and avoid Plaintiff in the business process, continuing to communicate with Plaintiff's direct report Mr. Hoy instead of Plaintiff.

337. Additionally, Mr. McColly began dis-inviting Plaintiff to the Executive Committees product meeting update which occurred the second week of every month; Plaintiff had previously presented business updates for adPlanet.

338. As for Mr. Wohl, in the nine (9) weeks Mr. Wohl supervised Plaintiff, he complained about adPlanet's "sales pipeline" being underdeveloped which was wholly off base.

339. In reality, Plaintiff's sales pipeline reflected a projected $3.7 million in sales opportunities for 2023, which would be a significant increase over 2022.

340. Moreover, this pipeline was over double the size of the biggest projected pipeline by the prior *combined two salespeople* when they were in charge of direct sales at Coinstar.

341. Moreover, during those nine (9) weeks Mr. Wohl supervised Plaintiff, Plaintiff had ramped up direct ad sales to a significant level in the latter part of the fourth quarter which generated revenue of approximately $436,000 that quarter; notably what Plaintiff achieved was more than the *two* salespeople achieved in approximately *eighteen* months.

342. In fact, adPlanet's weekly direct sales totals were higher for the last three weeks Plaintiff was employed at Coinstar than they had been any other week in 2022.

343. To be sure, the weekly totals for the three weeks between November 26, 2022 through December 10, 2022 went from $124,000, to $131,000, to $148,000 *per week* during Plaintiff's last three weeks.

344. By comparison, the next highest week – during all of 2022 – was a week in June of 2022 when the weekly total was $109,000.00 and the average week in the mid-five-figures.

345. Moreover, what Plaintiff generated in direct sales during November and December of 2022, accounted for over half of adPlanet's entire 2022 revenue according to one calculation.

346. Yet, during this time, any normal fluctuation in weekly sales, CEO McColly criticized Plaintiff.

347. However, at the same time, to leadership, CEO McColly would tout Plaintiff's teams and his performance.

348. Plaintiff began to fear that Mr. McColly and Mr. Pantalone, now along with – and with the hiring of Mr. Wohl – were setting him up for termination; Plaintiff simply could not believe that was what was happening given his measurable job performance.

349. But Plaintiff certainly did not suspect he was in his last few days of work, as December 28, 2022 drew nearer.

350. In fact, in December of 2022, *the day before Plaintiff was terminated,* CEO McColly sent out an email to leadership, *complementing Plaintiff's adPlanet performance*.

351. Specifically, CEO McColly wrote in this December 27, 2022, email highlighting adPlanet's strong 4th quarter: "please see the adPlanet weekly results which have been strong over the last several weeks."

352. The very next day, on or about December 28, 2022, in meeting with Mr. Wohl, Mr. Pantalone, and Judy Josey (hereinafter "Ms. Josey") of HR, Plaintiff was suddenly terminated.

353. During this call, Plaintiff was informed that Coinstar "no longer need[s] a head of sales role and as a result, [Plaintiff's] position [was] being eliminated" and his "last day will be on January 11."

354. Plaintiff asked for the reasons that his position was being eliminated and he was being terminated.

355. Mr. Wohl critiqued Plaintiff's performance as not being a "hunter".

356. Contrary to Mr. Wohl's assertion Plaintiff outperformed what the two salespeople, Mr. Marcou and Mr. O'Rourke, had sold in the 18 months prior, combined.

357. HR's Ms. Josey claimed Mr. Wohl would absorb Plaintiff's job functions (not the sales functions) and that Plaintiff's role was not needed.

358. At one point during this call, Plaintiff questioned if his job was being eliminated or he was being terminated for performance reasons, since both had been stated.

359. Mr. Wohl responded, "well it's a combination of both" and went on again about Plaintiff was not being a "hunter" despite his proven success.

360. Plaintiff pointed out he had no negative performance reviews.

361. Mr. Wohl then pivoted and claimed Plaintiff was being terminated solely due to job elimination.

362. Plaintiff pointed out the inconsistent reasons for his termination being given during the call.

363. Additionally, during the call, a third reason for termination was given; cost savings.

364. However, this reason made no sense in that Mr. Wohl had already been hired (at a higher compensation rate than Plaintiff) and then *additionally,* simultaneous with Plaintiff's termination, a new salesperson was hired to replace Plaintiff in the direct sales part of his job, adding a second salary obligation; both new hires assumedly have full benefits as well.

365. Comparatively, Plaintiff was only one person with one salary and did not even receive Coinstar benefits as he received them from his wife. Plaintiff questioned Mr. Wohl's decision to terminate him even partially based on performance when he had supervised him for such a short time; it had been approximately two months.

366. Plaintiff then asked again if they would "hire salespeople?"

367. Plaintiff also asked why he was not offered a "relegated role" performing just his sales functions.

368. Mr. Wohl admitted they would hire salespeople but did not offer or discuss with Plaintiff his ability to have such a job.

369. Plaintiff clarified something to the effect of, "meaning it would be a different level but I'm just wondering why you didn't consider putting me in a different sales role if the position is being eliminated?"

370. Ms. Josey referred the question to Mr. Pantalone or Mr. Wohl.

371. Mr. Wohl said I was "free to apply for any positions that we have available" and stated that "*I believe it's posted*…" . (Emphasis added).

372. Notably, Plaintiff checked after the termination call and *there was no job posted*.

373. At the end of the termination call, Plaintiff was given two weeks to finish working and his last day was to be January 11, 2023.

374. However, that same day of Plaintiff's termination call, his access to company records and emails was cut off.

375. Plaintiff did not know it yet but Mr. Wohl, Mr. Pantalone, and Mr. McColly *had already decided to hire/hired Ms. Ann Scotton* to perform the direct ad sales, replacing that part of Plaintiff's job.

376. It was not until just *after* Plaintiff was terminated, that he found out that Coinstar had *already* hired Plaintiff's replacement to perform his direct advertising sales work.

377. Ms. Scotton was hired, according to her LinkedIn page, in "December of 2022" as "Senior Digital Account Executive."

378. Ms. Scotton was hired within days or weeks of Plaintiff's termination and she replaced him as to the direct advertising sales part of his job.

379. Thus, while Plaintiff was making record direct advertising sales in November and December of 2022, Coinstar was quietly recruiting, screening, and hiring Ms. Scotton without his knowledge to be *his replacement*.

380. Notably, despite the termination call framing Plaintiff's termination as a job elimination, on a call that took place on or about December 30, 2022, with Mr. Pantalone and Mr. Wohl, Mr. Wohl *admitted* that he had hired Plaintiff's replacement when hiring Ms. Scotton.

381. Importantly, upon information and belief, Mr. Pezzello was in contact with Mr. Wohl, Mr. Pantalone, and/or Mr. McColly around the *same time* Plaintiff was terminated.

382. Moreover, upon information and belief, Mr. Pezzello and Mr. Wohl are close colleagues and possibly friends beyond that, as gleaned from his response to a question from Plaintiff during the termination call as to if Mr. Wohl was, "familiar with [Mr. Pezzello]" and if he knows him.

383. Mr. Wohl replied, "I know him but I don't like know him" and said something to the effect of "we're not like friendly or anything but we're you know professional colleagues. But I don't know him know him."

384. Plaintiff was surprised that Mr. Pezzello and Mr. Wohl even knew each other since, as noted, they did not work at Coinstar at the same time.

385. Additionally, on the termination call, when Plaintiff asked Mr. Wohl if he had spoken to Mr. Pezzello in the past six (6) months, Mr. Wohl's response was not, "I've never spoken to him" or even "no,"; his response was an uncomfortable denial and an odd comment about having "no need to."

386. The response seemed odd to Plaintiff if Mr. Wohl and Mr. Pezzello were only vague business colleagues and Mr. Wohl attempted to represent.

387. Moreover, Plaintiff learned at a point after his termination that Mr. Wohl defended Mr. Pezzello on a call with a third-party not long after Plaintiff's termination.

388. Finally and suspiciously, Mr. Pezzello viewed Plaintiff's LinkedIn profile on a day very near Plaintiff's termination, yet assumedly only Mr. Wohl, Mr. Pantalone, Mr. McColly and HR knew about the plan for Plaintiff's termination.

389. Mr. McColly, Mr. Pantalone, and Mr. Wohl terminated Plaintiff in retaliation for Plaintiff taking part in the protected activity of raising and reporting concerns with the hidden cameras and the lack of knowledge retailers with cameras on the premises had, both of which Plaintiff reasonably believed were unlawful under state law, including Rhode Island.

390. Mr. McColly, Mr. Pantalone and Mr. Wohl terminated Plaintiff in retaliation for Plaintiff reporting Mr. Pezzello, resulting in his termination, after taking part in the protected act of reporting racial discrimination against Mr. Hoy, and gender discrimination of multiple women.

391. Plaintiff's job was not eliminated; Mr. Wohl and then Ms. Scotton were hired to, and did, replace part of Plaintiff's job so he could be terminated with the pretextual reason of "job elimination."

392. Mr. Wohl did not previously perform work similar to Plaintiff's and thus, his absorption of Plaintiff's duties does not support job elimination, even if he was not initially hired to take over part of Plaintiff's job.

393. Tasks and responsibilities related to Plaintiff's work managing partnerships was *not* the type of work Mr. Wohl was hired for and was *not* the type of work he was already performing in his job.

394. In fact, prior to Mr. Wohl taking over parts of Plaintiff's job before and after Plaintiff's termination, he was *not* performing any similar functions to Plaintiff's job; his job had an entirely different level and suite of responsibilities and duties.

395. To be sure, the General Manager position, as conceived of by Mr. McColly as evidence by the job description, was to be a top-level thinker and to develop a multi-year strategic plan and vision for adPlanet.

396. In fact, the job description for the General Manager captures the essence of the General Manager job in this requested qualification: "This is an entrepreneur who will take a relatively new business and build it into a leader in the industry."

397. Plaintiff's job, in contrast, was simply to manage the day-to-day contacts with their current and future potential partners.

398. Plaintiff managed the day-to-day processes for their programmatic partnerships as well as managed their partnerships which were direct ad partners; in addition, Plaintiff also performed the direct sales once it was merged into his job in or about September of 2022.

399. Thus, because Mr. Wohl *was not performing similar work to the work in Plaintiff's job,* he "replaced" Plaintiff by the legal definition and according to precedent.

400. Ms. Scotton was hired within days or weeks of Plaintiff's termination to take over the remaining part of Plaintiff's job.

401. Since Ms. Scotton was hired just as Plaintiff was being terminated, and took over his job of direct advertising sales, she "replaced" him by the legal definition and according to precedent.

402. Thus, by legal definition, Plaintiff's job was not "eliminated" as Coinstar claimed.

403. Further, despite this direct sales job being posted weeks to months before Coinstar claims it eliminated Plaintiff's job, putting Plaintiff completely out of work, Plaintiff was neither offered the direct sales job nor *even told about the posting.*

404. According to one site, the direct sales job was posted 28 days previous to the date Plaintiff was looking on January 3, 2023, making the posting in very early December of 2022.

405. According to Coinstar HR (below), the direct sales job was posted in September of 2022.

406. Yet, whether in September or December of 2022, or somewhere in between, Plaintiff was *never* informed about the hiring for this direct advertising sales position or told about this posting; instead, Plaintiff was simply put out of work under the guise of "job elimination."

407. Again, it was not pattern and practice to not inform Plaintiff of the hiring of jobs under or above him.

408. In fact, Plaintiff had always been involved in the hiring of all team staff <u>until</u> Wohl and Scotton.

409. Further, Coinstar has contradicted itself on information related to the direct sales posting.

410. For example, on January 18, 2023[6], Plaintiff emailed Ms. Josey asking:

---

[6] Plaintiff also asked the HR if he was non-re-hirable; Plaintiff asked this question because he found it odd that he was not considered for this job – or even told that Coinstar was hiring for the position. Ms. Josey replied later that day, that Plaintiff is eligible for rehire.

I am still trying to find the job posting for the Senior Digital Sales Account Executive role we discussed on the 12/28/22 call with Lee [Pantalone] and Cliff [Wohl]. I noticed on our website that there are job postings that go back to December so I am not sure why I cannot find it? Where was it posted?

Ms. Josey responded:

Thought I had answered your question with the attached email I sent last Tuesday. We did not have an open sales position on the day we talked, nor do we have an open sales position currently. Again, my apologies if there was confusion during the notification meeting.

411. Contrary to Ms. Josey's assertion, Mr. Wohl *had* said on the termination call that there was a sales job "posted" when it was not, all of which contradicts Ms. Josey's email.

412. Later that day on January 23, 2023, Plaintiff further responded to Ms. Josey:

I apologize for any confusion. I am asking you when (specific dates) was the role for which Ann Scotton was hired posted on our website?

It was not posted in December, I know that.

During the discussions you had about eliminating my role, why didn't you consider recommending me to apply for the open sales position? If I had known my job was being eliminated, that would have been the most logical option.

The timing of discussing my role elimination occurred before Ann Scotton was hired.

I am just looking to understand why I was never considered for that position despite knowing my job was being eliminated, and to know when you posted the role Ann Scotton was hired for - or was it never posted on the website?

413. On January 24, 2023, Ms. Josey responded only:

Thank you for clarifying that you wanted to know when we posted the role that was subsequently filled by Anne Scotton. As we explained in the Notification meeting and was explained again when you met with Julie and Kevin [McColly], the role was posted on September 2, 2022, in response to a resignation notice received on September 1, 2022.

414. It is very unusual for Coinstar to post a job, a position *on Plaintiff's team*, and not tell Plaintiff about it for *four months*.

415. Plaintiff responded, asking:

I was always involved in the hiring of salespeople or ad ops people who reported to me. Examples: O'Rourke, Marcou, Hoy. I was also included in the hiring process for the previous general

managers-examples: Dusho, Pezzello. I was not aware and not involved in any way shape or form with the hiring of Cliff Wohl or Ann Scotton.

Why wasn't I included in the hiring process for both Cliff [Wohl] and Ann [Scotton] given that would have been standard practice given the last several hires?

416.  Ms. Josey simply did not respond.

417.  Plaintiff's termination based on "job elimination" and/or "performance", per his termination call, was pretext for retaliation under Title VII, along with state analogs, for reporting racial and gender discrimination, and pretextual for retaliation pursuant to the RIWPA.

418.  As a direct and proximate result of his employer's retaliation, in violation of federal and state law, Plaintiff suffered and continue to suffer loss of income and earning capacity; loss of work-related benefits, privileges, promotions, and status; experienced humiliation, and loss of standing in the community; suffered and continue to suffer from extreme emotional distress and mental anguish resulting in physical injury; and suffered other injuries.  All damages continue to date.

## COUNT I
### *RETALIATION (SEX AND RACE) – RETALIATORY TERMS AND CONDITIONS*
### *RETALIATION (SEX AND RACE) - RETALIATORY TERMINATION*
### **Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3**
### **Violation of RI Fair Employment Practices Act, R.I. Gen 1956 § 28-5-1 et seq. (*FEPA*)**
### **Rhode Island Civil Rights Act of 1990, R.I. Gen. Law § 42-112-1 et seq. (RICRA)**

419.  Paragraphs 1-418 are hereby incorporated by reference in their entirety.

420.  Plaintiff was protected from retaliatory harassment, discrimination and termination as a result of engaging in protected conduct under Title VII, FEPA, and RICRA.

421.  Plaintiff engaged in protected conduct, opposed unlawful conduct and exercised his rights under the Title VII, FEPA, and RICRA.

422.  Specifically, Plaintiff reported racial comments and gender-discrimination to leadership and HR, both of which protected under Title VII, FEPA, and RICRA.

423.  As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment by Defendant's agents.

424.  Additionally, as a result of Plaintiff's protected activity, Defendant's agents terminated Plaintiff in retaliation for his reports.

425.  But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated.

426.  Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII, FEPA, and RICRA.

427.  Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

428.  Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

429.  Defendant is vicariously responsible for the acts and omissions of its agents under Respondeat Superior.

## COUNT II
*WHISTLEBLOWING RETALIATION - RETALIATORY TERMS AND CONDITIONS*
*WHISTLEBLOWING RETALIATION - RETALIATORY TERMINATION*
***Violation of the Rhode Island Whistleblowers' Protection Act (WPA), R.I. Gen. Law § 28-50-1, et seq.***

430.  Paragraphs 1-418 are hereby incorporated by reference in their entirety.

431.  Plaintiff was afforded protections from retaliatory harassment, discrimination and termination because of taking part in a protected activity under the WPA.

432.  The WPA defines an employer as "any person…corporation or other business entity"; thus, Defendant was Plaintiff's employer.

433.  Plaintiff engaged in protected conduct under the WPA, when he reported concerns which he reasonably believed would have been a violation of Rhode Island and other states' law, regulation, and/or rule.

434.  As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment by Defendant's agents.

435.  Plaintiff was terminated in retaliation for these protected acts.

436.  But for Defendant's agents' retaliatory conduct, Plaintiff would not have been terminated.

437.  Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, WPA.

438.  Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

439.  Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

440.  Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

441.  Pursuant to § 28-50-4 Relief and damages, Plaintiff seeks treble damages.

## **PRAYER FOR RELEIF**

WHEREFORE, Plaintiff prays that this Court:

a.  Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b.  Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c. Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate him for his mental anguish, emotional pain and suffering, damage to his reputation, loss of standing in the community, and other damages incurred;

d. Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e. Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for their malicious conduct, recklessness conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f. Order, for all applicable Counts, that Defendant pay post-judgment interest where appropriate and allowable by law;

g. Order, for all applicable Counts, that Defendant pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

h. Retain jurisdiction of this action to ensure full compliance; and

i. Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

September 2, 2023

Respectfully Submitted,
**Plaintiff Robert Corkery,**
By his attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq. #9291
Munro-Delotto Law, LLC
400 Westminster St., Ste. 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com